**Arnold HOCHSTEIN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 87 Civ. 2094 (PKL).**

United States District Court, S.D. New York.

May 26, 1989.

Lowenthal, Landau, Fischer & Ziegler, P.C., New York City (Stephen R. Sugrue, of counsel), for plaintiff.

Benito Romano, U.S. Atty., S.D.N.Y., New York City (Craig A. Stewart, James L. Garrity, of counsel), for defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

LEISURE, District Judge.

This case was tried without a jury in mid May, 1989. The parties made pre-trial sub-

missions, and, after the conclusion of evidence, were given the opportunity to make brief post-trial submissions by May 19, 1989. The following constitutes this Court's findings and conclusion under Fed. R.Civ.P. 52(a).

The dispute involves federal withholding and Federal Insurance Contributions Act ("FICA") taxes alleged to be owed to the United States ("defendant" or the "government") by the plaintiff Arnold Hochstein ("plaintiff" or "Hochstein"). This liability is said to arise by virtue of the failure of plaintiff's former employer Safelon Corporation ("Safelon") to make FICA and withholding tax payments for the first and second quarters of 1981.

The taxes were assessed against plaintiff individually, pursuant to 26 U.S.C. § 6672.[1] Partial payments were extracted from plaintiff. *See* GX A-2; Tr. 94–95; Complaint ¶ 15.[2] He now sues: 1) to recover the partial payments, 2) for an abatement of the balance of the assessment, to the extent that it has not been paid by plaintiff, and 3) for an injunction prohibiting defendant from taking steps against plaintiff in the future to recover taxes or penalties arising from the employment or withholding taxes of Safelon. Defendant has counterclaimed for the balance allegedly due under § 6672(a), or $31,577.51, plus statutory interest to the day of judgment.

*Background*

Safelon was in the business of manufacturing polyethylene bags, until it ceased operations in 1981. While it was an active corporation, Safelon was affiliated with another concern called Multifilm Corporation.

Hochstein commenced his employment with Safelon in January, 1963. Throughout his employment with Safelon, he served as its Controller. By the time he left the company upon its dissolution in 1981, his annual salary was close to $35,000.

Throughout the relevant period, an individual named Ernest Eckstein ("Eckstein") was Safelon's President and its majority stockholder.

Safelon first began experiencing financial difficulties in the early 1970's. Prior to that time, all of Safelon's obligations, including payroll tax obligations, were paid in a timely fashion. *See,* Tr. 13–14. Because of these financial difficulties, however, in 1973 Safelon was for the first time unable to make required payments, including withholding and FICA taxes. At that point, partly because of its inability to meet federal employment tax obligations, Safelon entered into voluntary bankruptcy under Chapter 11 of the Bankruptcy Code. Tr. 15. Safelon emerged from bankruptcy with the aid of a factoring company, Lazard Financial Company, ("Lazard"), and through that factoring arrangement, paid the full amount of back taxes due.

Through 1979, Safelon continued to experience worsening financial difficulties, and, upon the withdrawal of Lazard, found itself in need of new sources of financing. Eckstein entered into negotiations with a New York commercial finance company, Rosenthal & Rosenthal ("Rosenthal"). In April of 1979, Safelon and Rosenthal entered into a financing agreement (the "Agreement"), whereby Rosenthal supplied operating funds to Safelon, pursuant to a formula based on Rosenthal's interest in Safelon receivables and assets. *See,* PX 1. In return for these advancements, Safelon assigned, as collateral security, accounts receivable, inventory, machinery and equipment, furniture, fixtures and vehicles. Hochstein had nothing to do with the negotiation or execution of the Agreement, and was not called upon to consult with Eckstein or anyone else regarding the accomplishment of this arrangement. *See* Tr. 21.

---

1. Section 6672(a) of the I.R.C. reads as follows: Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade any such tax or the payment thereof shall, in addition to the other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded or not collected, or not accounted for and paid over....

2. References in the form "PX __" are to numbered plaintiff's exhibits, "GX __" to lettered government exhibits, and "Tr. __" to specific pages of the trial transcript.

Subsequent to the execution of the Agreement, checks received by Safelon from customers were immediately endorsed over to Rosenthal. Other checks were actually sent directly to Rosenthal by customers. *See e.g.*, Tr. 24–25. Under the Agreement, Rosenthal had the power to directly endorse, for itself, checks that were made out to Safelon; Rosenthal so endorsed such checks whenever it received them. Tr. 28. A Safelon endorsement was not needed for transmittal of checks from Safelon customers to Rosenthal accounts, and Rosenthal received such checks regularly. Safelon was not permitted to maintain its own discretionary accounts, or to collect its own accounts receivable. Tr. 26–27, 116.

Hochstein's activities for Safelon during the period that the Agreement was in force were substantially governed by its terms.[3] Tr. 24–25. Hochstein was Safelon's general contact with Rosenthal, and would make specific requests to Rosenthal for funds, indicating the reason for such requested disbursements. Rosenthal would respond to those requests, in accordance with Safelon's perceived needs, under the Agreement. *See*, Tr. 100–03. Rosenthal would not, however, earmark any specific purposes for the funds, and maintains that it had no control of expenditures once the monies went to Safelon. The Rosenthal disbursements, however, were Safelon's *only* source of operating funds. Tr. 30, 117. Although the Agreement stated that it was Safelon's obligation to make all tax payments, those taxes could only be paid from the specific funds advanced by Rosenthal. Tr. 75, 115. Safelon never held back funds or receivables from Rosenthal to make these, or any other, payments.

By 1981, sales continued to decline and the financial position of Safelon worsened. Rosenthal refused to make additional funds available, Tr. 34, and a decision was made to liquidate the Safelon debt to Rosenthal. *See*, Tr. 114. During the fourth week of January, 1981, Safelon ceased to make federal withholding and FICA tax payments on behalf of its employees. Safelon continued to operate and pay employees, albeit on

a significantly reduced scale, through the second week of May, 1981. The funds secured from Rosenthal were insufficient to meet the entire payroll, to pay the payroll taxes, and even to heat the building. *See* Tr. 36. Consequently, the heat to the plant was cut off, the plant was operated on a reduced ⅓ day shift, and most non-supervisory employees were laid off. *See* Tr. 36, 38. These developments occurred in the winter months. The temperatures in the plant were as cold, and often even colder than, the temperatures outside.

The reduced workforce continued to process the supplies and inventory which Safelon had already purchased, through the first and second quarters of 1981. The paychecks that the remaining employees continued to receive were for services *already* performed; wages were therefore owed and due to employees by the time Rosenthal made disbursements for those periods.

At trial, the government made much of the fact that payments for a generator, which was acquired and operated after the heat was cut off, were not provided for by specific Rosenthal disbursements. *See, e.g.*, Tr. 65. To the extent that these payments occurred, they were clearly *de minimus*, and did not represent any significant prioritizing of payments over the liabilities to the IRS. The government additionally introduced a single Safelon "authorization" for a $10,000 payment by Rosenthal to a third party. *See* GX F; Tr. 59. That "authorization," however, was issued *at the request of Rosenthal*. *See*, Tr. 122. That payment merely added to the more than $800,000 debt already owed by Safelon to Rosenthal. It did *not* represent a positive cash balance in any account of Safelon, or an ability of Hochstein to make independent disbursements of funds. Tr. 69, 123.

Substantially all of the demands for payment by Safelon's creditors went unsatisfied after the fourth week of the first quarter of 1981. *See, e.g.*, Tr. 36, 45–47; PX 4. As noted above, the only significant payments made after that date were to the

---

**3.** A Safelon employee named Fred Reitbower initially had responsibilities under the Agreement similar to those that Hochstein later performed. Reitbower left Safelon in 1980. *See* Tr. 32–34, 61.

remaining employees, for services which they had already rendered. Hochstein understood that the obligation to pay already-earned wages to workers was an inflexible legal requirement. *See,* Tr. 70.

In 1981, plaintiff and Eckstein were the only two individuals authorized to sign checks on Safelon's account. Tr. 58. Plaintiff signed Safelon's withholding tax returns and disbursements to creditors. Hochstein was *not,* however, involved in any business decisions involving the operation or production aspects of the plant, including whether raw materials were to be purchased or processed, whether the plant would continue to operate in any capacity, or whether employees would be laid off. *See e.g.,* Tr. 11–12.

■ Hochstein was never a shareholder, director or officer of Safelon. *See, e.g.* Tr. 9, 17.[4] He was, however, identified as Safelon's "treasurer" in a bank financial document with Hudson Valley National Bank in 1978, *see* GX P; Tr. 15, 57, and on one piece of correspondence to Rosenthal. GX F. The financial transaction with Hudson Valley National Bank required that Hochstein be listed as a corporate officer. Tr. 17. Hochstein was never aware of any corporate resolution nominating or designating him as treasurer, and he never received any additional benefits or remuneration for such a position. Tr. 18. The statement of Safelon's corporate officers which was executed in conjunction with the Rosenthal Agreement did not list Hochstein as an officer. *See* PX 2, Tr. 31.

Hochstein was generally responsible for preparation of Safelon's tax returns, Tr. 64, and he prepared a tax return for the first quarter of 1981. *See* PX 5. That return indicated payment of the obligations for the first three weeks of the quarter, and a failure to make subsequent payments. Safelon could not make those payments because Rosenthal did not make sufficient funds available. *See* Tr. 51, 117.

Hochstein's role in the continuing operations of Safelon after the third week of the first quarter of 1981 diminished. He would typically process receivables for Rosenthal in the morning, and continue his active search for new employment during the rest of the day. Tr. 39. In making requests for disbursements from Rosenthal, Hochstein stressed that payment of the employment taxes was of the "highest priority," Tr. 56, and he understood that failure to pay those taxes could result in penalties. Tr. 67–68. Throughout this dispute with the IRS, Hochstein has cooperated fully with audits and investigations by the IRS. *See, e.g.,* Tr. 52–55, PX 6.

In March of 1981, Eckstein conducted a sale of the remaining physical assets of Rosenthal, which satisfied the balance of the amounts due Rosenthal. Rosenthal actually purchased the assets of Safelon, Tr. 41, and then sold them at auction to recover its interests. *See* Tr. 44; PX 8.

*Discussion.*

■ As noted, the relevant statute here is 26 U.S.C. § 6672.[5] The burden of proof in recovery cases under that provision is on the taxpayer/plaintiff; the assessment of the IRS is presumed to be correct. *See e.g., Ruth v. United States,* 823 F.2d 1091, 1093 (7th Cir.1987); *United*

---

**4.** The government actively attempted to establish that Hochstein was an officer of Safelon, but nevertheless vigorously argued that liability is not dependent upon formal corporate titles.

As indicated below, the legal position of the government is essentially correct; the status, duty and authority of the person, regardless of their formal title, is determinative. *See, e.g., Gephart v. United States,* 818 F.2d 469, 474 (6th Cir.1987). Nevertheless, it is clear that Hochstein was not an officer or shareholder of Safelon, and that may be relevant to, although not dispositive of, the "responsible person" inquiry.

**5.** At trial, plaintiff's counsel argued that I.R.C. § 3505(b) might also be relevant. That provision provides, *inter alia,* for tax liability for third party lenders, where the lender is aware that the employer is using the funds specifically for the payment of wages, and where the advanced funds are insufficient to cover employment taxes.

Although an action against Rosenthal might have been pursued under that provision, that is clearly irrelevant to the issues in this case. It is well established, and conceded, that the IRS could pursue any of a number of responsible persons who might be liable. Possible liability of other parties, even if it appears they might be "more" liable than plaintiff here, is *not* to be considered for the present determinations. *See, e.g., Howard v. United States,* 711 F.2d 729, 737 (5th Cir.1983).

*States v. Pomponio,* 635 F.2d 293, 298–99 (4th Cir.1980); *Gold v. United States,* 506 F.Supp. 473, 477 (E.D.N.Y.), *aff'd without opinion,* 671 F.2d 492 (2d Cir.1981).

The issues presented by this case are relatively straightforward. As the parties recognize, the only contested matters are whether plaintiff was a "responsible" person under the statute, and, if so, whether his non-payment was "willful." There is comparatively little case law on these specific elements in this Circuit, but the standards are uncomplicated and generally well-developed. Evaluation of the evidence presented at trial, in light of the guidance provided by cases from this and other circuits, indicates that the plaintiff has sustained his burden on both of the determinative issues.

### 1. Responsible Person.

Section 6672 casts a wide net of liability over persons who may be deemed "responsible." Whether a person is responsible depends on his "status, duty and authority" within the corporation. *Mazo v. United States,* 591 F.2d 1151, 1156 (5th Cir.), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). As the impressive array of cases cited by the government demonstrates, there are significant limitations on what a plaintiff may show to establish that he was not responsible. It is no excuse, for example, that an individual fears losing his job as a consequence of paying the required employment taxes. *See e.g., Howard v. United States,* 711 F.2d 729, 734 (5th Cir.1983); *Gephart v. United States,* 818 F.2d 469, 475 (6th Cir.1987). Similarly, proof that an individual was acting at the direction of a superior does not mean that he or she is not "responsible." *Roth v. United States,* 779 F.2d 1567, 1572 (11th Cir.1986).

■ None of the cases cited by the government, however, address the situation presented by this case and this plaintiff, and the unmistakable thrust of the law indicates that this plaintiff was not a responsible person. The touchstone of the responsible person inquiry is *"effective power to pay." Howard, supra,* 711 F.2d at 734 (emphasis in original). The test is one of substance, rather than form, and the

duty to pay over employment taxes is not absolute, without reference to the reality of the particular situation of the taxpayer and corporation. *Cf. Slodov v. United States,* 436 U.S. 238, 254, 98 S.Ct. 1778, 1788, 56 L.Ed.2d 251 (1978). *See also Godfrey v. United States,* 748 F.2d 1568, 1576 (Fed. Cir.1984); *Drummy v. United States,* 84–1 U.S. Tax Cas., CCH ¶ 9105 (D.Mass.1984). A cursory examination of plaintiff's position during the period following the third week of 1981 reveals that he had nothing approaching the requisite power.

■ It is certainly true, as the government argues, that the Safelon corporation had a duty to cease operations in order to avoid generating additional tax liabilities. *See Thibodeau v. United States,* 828 F.2d 1499, 1506 (11th Cir.1987) ("the government cannot be made an unwilling partner in a business experiencing financial difficulties"). In *Thibodeau,* the taxpayer argued that it was necessary for him to sign certain checks in order for him to keep the business operating as a going concern, and the failure to pay the employment taxes was therefore justified. Plaintiff makes no such argument here. It is abundantly clear that Hochstein *himself* had no power to cease Safelon's operations, no power to fire the remaining supervisor employees, or any input into the decision to continue processing Safelon's supplies on hand.

Hochstein found himself in a position of having insufficient funds from Rosenthal, *no* independent funds from Safelon, and already-generated tax and wage liabilities. He was powerless to do anything other than what he did, namely, to sign over the checks for the wage funds. Plaintiff's status, duty and authority within the Safelon corporation distinguish him from those cases where individual tax liability has been found, and compel a conclusion that he was not "responsible" under § 6672.

### 2. Willfulness.

If, contrary to the Court's conclusion, Hochstein were in fact a responsible person under § 6672, his failure to make the required payments would also have to be "willful" for liability to exist. The standards for the required willfulness are well established:

A responsible person is liable under section 6672 only if he or she "wilfully" fails to ensure that withholding taxes are paid. Wilfulness requires merely a voluntary, conscious and intentional act; a bad motive or evil intent is not necessary. *Mazo v. United States,* 591 F.2d 1151, 1154 (5th Cir.), *cert. denied,* 444 U.S. 842 [100 S.Ct. 82, 62 L.Ed.2d 54] (1979). A considered decision not to pay the taxes owed, evidenced by payments to other creditors with knowledge that withholding taxes are due, establishes willfulness.

*Wood v. United States,* 808 F.2d 411, 415 (5th Cir.1987). *See also Ruth v. United States,* 823 F.2d 1091, 1094–95 (7th Cir. 1987); *Kalb v. United States,* 505 F.2d 506, 511 (2d Cir.1974).

■ The willfulness requirement is satisfied where the responsible person made the conscious and deliberate choice to pay other creditors instead of paying the government. *Spivak v. United States,* 370 F.2d 612 (2d Cir.), *cert. denied,* 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967). There is, however, some element of personal fault; "[t]he fact that the provision imposes a 'penalty' and is violated only be a 'wilful failure' is itself strong evidence that it was not intended to impose liability without personal fault." *Slodov v. United States,* 436 U.S. 238, 254, 98 S.Ct. 1778, 1788, 56 L.Ed.2d 251 (1978).

■ As indicated by the factual findings and the discussion above, there is no evidence of significant payments to other creditors, and it is clear that Hochstein did not give priority to other business obligations of Safelon, over the liability to the I.R.S.[6] It is apparent that when the funds were available, Hochstein made the required payments. Plaintiff has met his burden of establishing that, even if he was

a responsible person, he did not act willfully. Accordingly, plaintiff cannot be liable for the assessment.

## CONCLUSION

Judgment will be entered for plaintiff on the amounts paid by him under the individual § 6672 assessment, with interest. The counter-claim of the government is denied, the remainder of the assessment is abated, and the government is enjoined from taking further steps to recover the Safelon employment taxes from plaintiff.

Plaintiff will prepare and submit a judgment, in proper form for signature, to the Judgment Clerk of this Court by June 9, 1989.

SO ORDERED.

---

**6.** The government cites *Collins v. United States,* 848 F.2d 740 (6th Cir.1988) for the proposition that payment of employee wages must be subjugated to payment of taxes. In that case, the taxpayer paid wages *and* company expenses in lieu of employment taxes, "as a matter of sound business judgment ... in order to keep the corporation operating as a going concern." *Id.* at 741. Also, on the evidence in that case "it

was undisputed that [plaintiff] was the person responsible," and that he "voluntarily, consciously, and intentionally paid other creditors rather than paying over the withheld taxes." *Id.* at 742.

*Collins* merely reiterates the established standards set out above, and does not create a special definition of responsibility or willfulness which would include the plaintiff in this case.